Mr. Perry. Good morning your honors. May it please the court, counsel. My name is John Perry. I'm appointed counsel for the defendant, Maximino Osuna-Samaniego, in this matter. For the record, I would like to reserve two minutes for argument. Your honor, the facts of this case are fairly straightforward. On January 18, Mr. Osuna-Samaniego was proceeding down a Spokane County road or street, Broadway Avenue, when he was pulled over by two officers of the Spokane Valley Police Department, who were also Spokane County Sheriff's deputies. The officers informed him that they observed him following another vehicle too closely. At that time, Mr. Osuna-Samaniego presented appropriate driver's license identification and registration to the vehicle. He was not, according to testimony of the officers, in any way indicating that he was intoxicated under the influence of any substances or alcohol. The vehicle registration was in the name of a woman whose first name was Shawna. Mr. Osuna was asked who owned the vehicle, and he indicated that the driver, the owner of the vehicle's name was Shawna. He didn't know. Yes? You're not challenging the reasonableness of the initial stop for following too closely, are you? We are not, your honor. So under Chavez-Valenzuela and its progeny, doesn't this case sort of turn or fall on whether or not there were sufficient factors known to the officers at the time they pursued the continued detention of your client to justify keeping him further on the street, which ultimately led to the consent search of the vehicle? Yes, your honor. Actually, it's twofold. The particularized suspicion, which I believe is the language that the Chavez Court uses, as well as the voluntariness of the consent. Well, the district court, let's separate the two, but let's take the first one. The district court identified, as I recall, a number of factors or facts that the sheriff's deputies were aware of as soon as they determined what house your client had come from, and I believe Judge Whaley found that those factors were sufficient under Chavez-Valenzuela to justify continued detention and ultimately the search. How would you argue to us that Judge Whaley's findings are clear error, which it seems to me is the standard with regard to the findings of fact, and then the second question would be whether as a matter of law those facts would be sufficient. Have I got this right? The proper standard of review of a decision to deny a motion to suppress is de novo. Well, it would be a mixed question of law and fact, would it not? We'd first have to determine whether or not the district court engaged in clear error in finding those facts, and then secondly, as a matter of law, de novo, whether that's good enough under Chavez-Valenzuela to continue the detention. That would be correct, your honor. And there is one factual matter that we dispute as far as the court's findings of fact, and that we believe would be clear. I now understand what the court is asking. So what factual matter is that that you dispute? Your honor, the factual matter is the voluntariness of the consent. The report of Officer Banks, who didn't testify either in the state court proceeding, nor did he show up in the Well, that's where the factual dispute resides, is consent. So if I take, then, the facts that the district court cited with regard to the validity of the continued detention, do you lose, at least on that first issue, as to the fact that they could continue their investigation based on the facts that the court found after the hearing? So what this case really turns on is whether or not the consent was voluntary. No, we do not lose on those issues, your honor. Tell me what facts with regard to the continued detention are in dispute by the district court. Yes, your honor. I have a slightly preliminary question, or at least it would be clarifying for me to answer it in this order. Are you contesting the preliminary questions as being an extension of the detention, or only the determination to ask for a consent search once those preliminary matters were established? I.e., the question, where were you coming from, and what was the last name of the person on the registration? Or are you only, are you assuming that those questions were okay, but the problem is that after he got the answers to it, there wasn't sufficient basis for continuing? Your honor, to answer the court's first question, I believe that the question of where you're coming from in a context of a traffic stop for following too closely may be unnecessarily invasive, and in the nature of the fishing expedition questions that the Chavez-Valenzuela court decides, and I know what the court's going to say. They're going to say Chavez-Valenzuela said that in a speeding case, it was okay to ask the person, it was dicta, I believe, but it was okay to ask the person where he was coming from and where he was going. The operative words there are, in a speeding case, or in a following too closely case, where you're going is relevant because where's the fire? Are you in a hurry? And a lot of times, you can get an officer, you can get an admission, you know, jeez, I'm late for my bowling appointment. So the guy's admitting he was speeding. Where you come from is a slightly different question. Does that same logic apply if somebody's following too closely? I mean, people get impatient, and so they're riding the bus. Exactly, your honor, exactly. That does, but they didn't ask him where he was going. They said, where are you coming from? And I think that the Valenzuela court didn't go into it in great detail, but I would submit that, for the reasons I've stated, and I do need to move on, I see, that question is inappropriate. Basically, there are only two factors in this case that were cited. Those were that he didn't know the name, the last name of the person, of the owner of the vehicle, and that the officers, leading to belief on the officers' part, they claimed that the vehicle was stolen, and that his origin was a place that the officers claimed they had heard information, was a location where drug activity had been known to occur. Those are the two factors. Now, the Perez case is cited in a respondent's brief, saying that... Well, there was one other, wasn't there? That he recognized, that Deputy Banks recognized Mr. Osuna's car as having been seen at that location? Part and parcel, Your Honor. I would say part and parcel. That's the same suspicion. Okay, this guy, in our opinion, came from a house where drugs are being sold. Okay, so... So you think that's one fact, whereas the district court thought it was two? I don't know that the district court... A, there's a house where drug activity is going on, and B, Mr. Osuna's car had been seen by deputies... At that house. ...stealing out the house. The car was seen at that house, so it all goes back to the house. Those two factors are insufficient. First of all, the suspicion of theft was belied because once the vehicle came back clean, the officers still proceeded to search the vehicle. There's also evidence in the decision of the state court that the officers didn't do what they routinely do in terms of look for scratch marks around the ignition, things like that. They never believed that this car was stolen, in my opinion, and I think the facts support that. They found out it wasn't stolen, searched the car anyway. Well, they found out it hadn't been reported stolen. There's a difference. Right. Is there not, counsel? Well, they had no... They did everything... The first name of the driver was correctly identified. The officers no longer believed that it was stolen at the time they... Why do you say that? I mean, just because a car has not been reported stolen to the police doesn't mean it hasn't been stolen. Your Honor, my client said the driver's name was Shawna. The driver's name was Shawna. There was no indication the vehicle had been stolen. He had no criminal problems on the search. His driver's license was valid. I would submit that there's no more reasonable basis under those facts. As for origin, Your Honor, the Perez case and the cases that it cites all named more than just origin or destination as a factor. They all have three or four factors, Your Honor. And without belaboring the point, that's in our reply brief, I think, in some detail. I see I'm running out of time. As to the consent, the factual issue that we dispute is that the Officer Bates who testified said before the district court that he heard consent being given. The problem here is that Banks' report says Mr. Osuna did not clearly understand everything I was saying. But didn't the district court find after hearing the testimony that that was a typographical error? Yes, it did make that finding, and we dispute that. And the reason is, if you look at Banks' report, the Officer... We're disputing it on the basis of the report itself, which the district court found, as a matter of fact, after listening to the testimony, was a typographical error. So I don't understand how we can declare that to be clearly erroneous. The report is inconsistent with what he stated under oath. The district court heard countervailing testimony from a live witness who explained that that was a mistake. But it was refuted by his own report, which was also before the district court, because Bates said in his report that he was checking the license and registration. You're now asking us to make the credibility determination, that we have to believe the report and not what the testimony was. I'm saying that this... Or it is more accurate. I'm saying that this finding isn't supported by the evidence. For the court to say that... The government has the burden of proof here. They did not bring in Banks, who is the guy that took the statement. Why did they do that? I think it's a failure of burden of proof. Just because one officer said from far away, well, I heard him give consent and it sounded voluntary to me. You have a report from an officer saying he did not understand me. That officer never came forward to contradict that. But didn't they also have testimony? I read something in the record about letters at the jail that he'd received from his wife, all written in English, that there was a detective who interviewed him... They did, Your Honor. ...and said, you know, we could communicate. He understood what I was saying. They most certainly did. And we don't know... Can't the district court consider all that? As I argued to the court, Your Honor, What we're talking about is what did the defendant understand at the time of the search? Not what he understood months later in jail or what he understood in the jailhouse when he was interviewed subsequently by the other police. These letters could have been interpreted for him. I get calls from Spanish-speaking defendants all the time who have somebody in the jail call and say, Hey, give so-and-so a call. You know, I'm his buddy. So there are people that translate things for people. It was sent to him in English. There's no understanding indication that he understood it. Plus, what we're talking about is what happened at the time. So consent is failure proof. The other aspect I want to bring up is the fruit of the poisonous tree. I believe that the purge, the taint, was not broken. The government doesn't really challenge that. They say, well, the arrest was legal, therefore poisonous tree doesn't apply. But they don't go into whether or not the taint under Wong's son was broken or not. Mr. Osuna was in custody from the time he was initially arrested on the road to the time that he gave the subsequent statements. Unlike the defendant in Wong's son who showed up three days later and voluntarily confessed. So poisonous tree applies, Your Honor. Thank you, Mr. Perry. I think we understand that. So it turns on whether there's poison. That's correct, Your Honor. All right. Thank you. Your time has expired. Thank you. And we'll now hear from Mr. Ahmed. Good morning, Your Honors. May it please the Court. Your Honors, my name is Ani Ahmed and I'm an assistant United States attorney in Spokane, Washington. Your Honor, you asked the essential question whether they did have reasonable suspicion to expand that stop at that point. I do want to point out that initially when Deputy Banks stopped the vehicle, he was a trainee and Deputy Banks was his training officer. Let me ask you a question. One of these two officers, I forget which banks, one of them said that he recognized the car from being in front of the drug house. I guess he means that he didn't realize it was that car until after they stopped it. But suppose he had realized. He had written down the license plate, apparently. Originally, what he had done is check the license plate. If he had simply seen this car and realized it was the car from the drug house, could he have just stopped the car and asked for consent to search? No, Your Honor. There would have to be a valid legal stop in order to ask for the consent to search. You can't just stop. Can you tell me why it's different? This has to be the basis for a continuing seizure, right? Yes, Your Honor. In other words, we're operating on the theory that the traffic stop was for whatever it was, it was essentially over and the question was could they continue to seize him? So was the statute any different for continuing to seize him than for seizing him in the first place? Yes, Your Honor. Let me distinguish something. I would say that my argument is that the stop was not over. When the officer asked Mr. Somniago whether he had proof of registration and who owned the vehicle, Mr. Somniago said a person named Shawna. At that point, when Banks asked the follow-up question, okay, well, where are you coming from? In his mind, at least by the testimony of Officer Bates, in their mind, they're thinking possibly the car is stolen. At that point, they're prolonging the stop just to determine whether the car is stolen and that's valid at that point. Now, when they go back there as a training officer and trainee and confer about this stop and Banks tells Bates, you know, I've been told about this vehicle before and Bates tells Banks, you know, I've been told about this vehicle before. At that time, it's instantaneous almost. They stop the car at 3.57 p.m. The drug dog comes, Kelo comes at 4.00 or 8.00 p.m. He's passing by on Broadway and they stop him. Deputy Bates tells Banks, well, ask him if he can consent to search the vehicle while I run his driver's check. At that point, they're not really prolonging anything. They're checking to see if the vehicle is stolen, if his license is in order. Now, he makes, I'm sorry, Your Honor. No, no, I wasn't saying that. Now, he makes the argument whether the stop was voluntary and whether Mr. Sanniago understood something, understood what the officers were saying. It kind of brings back the facts in the Perez case where the defendant continued he understood four words. All right, but that's a different issue. Let's stick to this one for now. Yes, Your Honor. What I'm still trying to isolate is so you would agree that the knowledge of the origin of the car wouldn't itself be a reason to seize the car, to seize them or to ask for consent to search the car? I would agree, Your Honor, with that. And that's the connection to the drug issue. The other has to do so does that mean that everything has to turn on the stealing issue? Well, Your Honor, everything turns on whether initially it was a valid stop or not. Now, whether that expansion... Let's assume it was initially a valid stop. But I'm still, what I'm having trouble with is how the drug information fits in if it wasn't, if it isn't itself a basis for the seizure. So then it has to be the suspicion of theft that's the reason for the continuing seizure? Initially, Your Honor, but I do want to point out one thing that when they conferred in the back of the vehicle they had different reasons. They did try to check out if the seizure if the car was stolen as to initially stopping or checking the registration out. But the consent to search, Your Honor, was based on the information that they had independently obtained from different sources. One... But that's why I began by asking you whether that information, which they apparently had before or could have had simply by looking at the car would have been a basis for stopping him without the traffic stop. And you said no. Well, Your Honor, I believe the court, maybe I misunderstood, but I believe the court was asking me whether they could have just stopped him and consented to search based on that information. But the facts of the case were different in this case. I understand, but I'm trying to understand whether you're saying that knowing that a car was parked in front of a house that somebody else said was a drug house is itself a basis for reasonable suspicion to see somebody and ask for consent to search a car. Okay, I understand, Your Honor. If the officer can reasonably articulate that criminal activity is afoot and that car is somehow connected or the driver of that car is somehow connected to that drug activity in that house, my position is yes. If he can articulate that well enough to say, yes, I had reasonable suspicion based on other facts that I knew, but just seeing a car outside of a supposed drug house, I would answer the question this way. Just seeing a vehicle without any other information. But that's what we have here. We have the vehicle and no other information. I thought the Supreme Court tells us that we have to look at the totality of the circumstances in this case. So we don't take them one factor at a time, do we? We consider everything that was then known to the officers as the stop unfolded. That is asked as a matter of Fourth Amendment jurisprudence under a totality of the circumstances analysis. Was it reasonable for the officers to continue their investigation? Yes, Your Honor, and I think what the Court's talking about is the Sims case, and they did talk about the totality of the circumstances and the scope of the search based on the totality of the circumstances known to the officers at the time. They didn't expand the scope and I think the Court understands this of the stop because of the possibility that the vehicle was stolen. They had that initially in their mind, but when they conferred and they said, you know, we've seen this car before and I don't believe based on the testimony of Officer Bates that they had thought about that information prior to this, but when they started conferring in the back of the vehicle and they said, hey, this vehicle I've been told about this vehicle before it was also after Mr. Somniago told the officer where he was coming from, that being on Broadway, and it started clicking for the officer at 9505. It was more than just that he'd been told that the house was a known drug den, but he had also personally seen this car at the house. Banks had but Bates was told independently from McCrary that that was a drug house, so when they found out the address, when they started conferring, they started saying, well, this vehicle and this individual, not knowing the owner of the vehicle, could be possibly involved in drug activity. I would also like to point out a factual inaccuracy on page 12 of the defendant's brief that indicates that it was Bates that suggested or 9505. Aren't you coming from 9505 East Broadway? That's not what happened. That's not what the testimony was in the suppression hearing. In fact, it was actually Mr. Somniago saying I'm coming from 9505 East Broadway, and that's when things started clicking for the defendant. At least in the police reports, the police the two officers said different things about that. One said he just pointed at a house, and the officer then said, oh, you mean 9555 Broadway, and the other one said that's in the police reports. I don't know what was in the But only one of them testified. Yes, Your Honor. Sorry, I think the other guy had a different recollection. Your Honor, Deputy Bates indicated and this is on SCR 25, Your Honor, that if he knew the address, he told me 9505 East Broadway. What was the time sequence exactly? It got a little murky for me. Did they were they asked him for the consent while they were checking the registration? That's correct. At what point did they check the registration and find out that it wasn't reported stolen? Was that before or after the consent was given? It was almost at the same time, Your Honor. Bates tells Banks when they're discussing this suspicion, will you go ask him to search the consent, see if he'll search the consent? I'm going to go run this registration. And at the time, as a testimony that Bates gave at the suppression hearing, he's watching Banks read the consent form. And he said, I didn't hear him read it to him, but it was in English. I got back out and I witnessed him signing it. So you're saying would it have been dispositive of the theft issue that if they had run their registration first and found out that it wasn't reported stolen? Mr. Estroma says it could still have been stolen, but you seem to be saying that really wasn't the basis for the search anymore. And factually, that's correct, Your Honor. I mean, at the point, it could certainly have been still stolen. They actually took him back to that address to confirm that he was coming from that address. So I think in their minds at that point, and based on Bates' testimony, it kind of moved on at that point. Yeah, they were a little suspicious he didn't know and that kind of roused their suspicions that he didn't know the name of the registered owner of the vehicle. He didn't know the whole name, but he knew the unusual first name. He only knew the first name. That's correct, Your Honor. But it wasn't just Mary. I mean, it was a first name that he wouldn't just know for no reason. That is correct, Your Honor. And that is why he asked a second follow-up question of where are you coming from? Thank you, Mr. Mudd. The matter just argued will be submitted and we'll next hear your argument in Chavez-Gonzalez.
judges: Rymer, Berzon, Tallman